## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JASON GOLDSTEIN and TAMMY HUTTEMEYER, individually and on behalf of all others similarly situated, | Case No. 9:22-cv-80569 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FANDANGO MEDIA, LLC, | |
| Defendant. | |

Plaintiffs Jason Goldstein and Tammy Huttemeyer, individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.       This is a class action suit brought against Defendant Fandango Media, LLC ("Defendant") for violations of the Video Privacy Protection Act ("VPPA").

2.       Defendant develops, owns, and operates a website and mobile application, both titled "Fandango," that allow users to "[c]atch the newest trailers, browse Rotten Tomatoes[] scores, find the latest showtimes, and buy tickets to the right movie at the right time with ticketing to more than 33,000 screens nationwide."[1]

3.       Unbeknownst to Plaintiffs and members of the Classes, Defendant knowingly and intentionally discloses its customers' personally identifiable information whenever they purchase

---

[1] FANDANGO MOVIE TICKETS & TIMES, https://play.google.com/store/apps/details?id=com.fandango&hl=en_US&gl=US.

a movie ticket or watch a video clip on Fandango.

4.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710.  "Personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

6.      Plaintiffs bring this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

### I.  Overview Of The VPPA

7.      The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  Congress responded by passing the VPPA with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs

they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

8.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).

9.      The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).

10.     A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.     Defendant is a Video Tape Service Provider

11.     Defendant sells tickets to movies and contracts directly with more than 40,000 theaters worldwide, serving as a substitute for a theater's box office.

12.     Fandango also hosts and delivers thousands of movie trailers, interviews, select scenes, and premiere videos.[2]  These video clips are all available for viewing on the Fandango website and app.

## III.    The Fandango App: Defendant Violates the VPPA by Knowingly Disclosing Customers' PII Through its Mobile Application

13.     Defendant develops, owns, and operates a mobile application ("Fandango App").

14.     Consumers can download the Fandango App through the Google Play Store on Android devices or the Apple App Store on iOS devices.  Once downloaded, the Fandango App

---

[2] FANDANGO.COM, MOVIE TRAILERS – FANDANGO.COM, https://www.fandango.com/site-index/movietrailers.html.

requests permission from the user to access their location through the mobile device's GPS and to allow push notifications.  Users may also register an account with the App, a process that requires them to input their email addresses.

15.     At no point does Defendant receive permission from users to share personally identifiable information or video viewing information with third parties.

16.     Consumers can use the Fandango App to purchase movie tickets and watch movie trailers and other clips.

### A. Testing Reveals That Defendant Is Illegally Sharing Users' Video-Viewing Information With A Third Party

17.      In the Fall of 2021, Plaintiffs' counsel retained a private research company to conduct a dynamic analysis of the Fandango App.  The researchers analyzed the disclosures made from Fandango to third parties whenever a registered user purchases movie tickets or watches video clips through the Fandango App.  This analysis revealed that Defendant transmits to a third party information sufficient to identify class members and the movies and video clips they watched.

18.     The analysis established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its App.

19.     APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[3]

20.     Google Analytics is an example of an API.  When developers, like Defendant, integrate the Google Analytics API into their applications, Google will "create reports to answer

---

[3] IBM CLOUD EDUCATION, APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

questions like: How many daily active users has my Android app had in the last week?  How many page views has each of the top 10 page URLs for my site received in the last 28 days?"[4]   In exchange, Google retains and repurposes the data the application transmits, which Google then uses to support other ventures, like targeted advertising.

21.     Defendant integrates the Carnival Mobile Marketing API (the "Carnival API"), which is owned by Sailthru, Inc. ("Sailthru"), into its App.

22.     The dynamic analysis found that when a user creates an account and purchases movie tickets or watches a video clip through the App, Defendant transmits to Sailthru, through the Carnival API, a user's e-mail address, advertising ID, location data, and a unique video identifier for the movie ticket purchased or video clip watched.

23.     Industry leaders,[5] trade groups,[6] and the Eleventh Circuit[7] agree: an email address constitutes personally identifiable information.

24.     An advertising ID ("AAID") is a unique string of numbers that identifies, at a minimum, a particular device (such as a mobile phone).

25.     The identifier for videos watched or movie tickets purchased ("Video ID") is a short string of numbers that links to a title for that video or movie.  Using publicly available tools, an ordinary person can easily uncover a Video IDs corresponding title.

---

[4] GOOGLE ANALYTICS, ANALYTICS DATA API OVERVIEW, https://developers.google.com/ analytics/devguides/reporting/data/v1.

[5] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising");
[6] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).
[7] *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual.  They can prove or establish the identity of an individual.")

26.     Sailthru is receiving these identifiers through its API, "devices.carnival mobile.com," which is the Carnival Mobile Platform.[8]

### i.  Overview Of Sailthru's Carnival API

27.     When developers build a mobile application, they typically rely on third parties to provide services for the app, like marketing and analytics.  Sailthru is one such third party.  Sailthru is a single product company, offering what it describes as a "cross-channel marketing platform."[9] Sailthru touts its platform as "purposefully built for helping marketers develop personalized experiences to each and every consumer across email, web, and mobile."[10]

28.     Put differently, Sailthru's platform has three distinct functions.  First, Sailthru collects and analyzes user data.  Second, Sailthru uses its analysis to develop hyper-personalized content for each user.  And third, Sailthru allows marketers, like Defendant, to coordinate and send this content through push notifications, email blasts, and in-app solicitations.

29.     Sailthru personalizes content down to the individual user.  Sailthru boasts that it provides "[t]he industry's most robust customer profile."[11]  These customer profiles are so valuable that Sailthru has become "the largest sender of personalized email in the world."[12]

30.     As discussed in greater detail below, Defendant knowingly and intentionally discloses class members' PII to Sailthru so it can analyze and help market the Fandango App.

### ii.  Defendant Discloses Class Members' E-Mail Address and Location To Sailthru

31.     Sailthru's marketing materials explain that, when integrated into a mobile app, its

---

[8] CARNIVAL.IO, BY SAILTHRU, http://web.archive.org/web/20170814101618/http://carnival.io/index.html (archived: Aug. 14, 2017).

[9] SAILTHRU, PRODUCT OVERVIEW https://www.sailthru.com/product/.

[10] Id.

[11] Id.

[12] SAILTHRU, HOME PAGE, https://www.sailthru.com/.

API will collect identifying information from users and combine this information to create a "user profile," with "[e]ach user profile contain[ing] data for a single user."[13] "This includes user predictions, engagement, and location information, as well as the customers you've added to your user profiles."[14] Sailthru provides examples of the data it compiles into a user profile.[15]





[13] SAILTHRU, USER PROFILE, https://getstarted.sailthru.com/audience/managing-users/user-profile-lookup/.

[14] *Id.*

[15] *Id.*

32.     Sailthru develops these customer profiles so marketers, like Defendant, can utilize its platform to engage with "customers and audiences on an individual basis."[16]

33.     Users can create an account for the Fandango App.  The dynamic analysis found that when an account-holder purchases a movie ticket or watches a video clip, Defendant discloses that consumer's e-mail address, advertising ID, location data, and the Video ID to Sailthru via the Carnival API.

34.     Sailthru combines this information to create a unique "user profile" for each Fandango consumer.

35.     As noted above, industry leaders, trade groups, and even the Eleventh Circuit agree that an email address constitutes personally identifiable information.  Indeed, an entire market exists for pairing an email address to an identity.[17]

36.     The location data transmitted is precise enough to identify what city or geographic region a user is located.

37.     The advertising ID, at a minimum, identifies a particular device.

      **iii.   Defendant Discloses To Sailthru The Movie Tickets Purchased and the Video Clips Watched**

38.     When Defendant transmits a user's identifiers, it also transmits a user's video ID which identifies the movie ticket purchased or the video clip watched.

39.     Any ordinary person can link a Video ID to a corresponding video title.  That person need only open a browser, type the Video ID alongside "Fandango," and the search will return results showing the corresponding title.  Googling "fandango 225415," for example, will return

---

[16] SAILTHRU, PRODUCT, https://web.archive.org/web/20160707205453/http://www.sailthru.com/product#personalization-engine
[17] *See, e.g.*, BEENVERIFIED, https://www.beenverified.com/.

results for the movie *Spider-Man: No Way Home* (225415 is the Video ID for *Spider-Man: No Way Home*):



40.    Further, the Video ID is included in a movie's URL address for Fandango's website:



41.    Based on the foregoing, a Video ID readily permits an ordinary person to identify a specific individual's video watching behavior.

42.    Sailthru also verifies that Fandango provides it with enough information to match the Video ID with a video title.  Through its user profiles, Sailthru tracks a user's "entire purchase history to see if they strictly buy on promotions, [] allowing you to adjust your user profile marketing accordingly."[18]  Sailthru provides the following illustration:[19]

---

[18] SAILTHRU, 5 WAYS SALTHRU'S USER PROFILES MAKE MARKETERS' LIVES EASIER
https://www.sailthru.com/marketing-blog/sailthru-user-profiles/
[19] SAILTHRU, TRAINING VIDEO, USER PROFILE OVERVIEW https://getstarted.sailthru.com/training-videos/



43.     Fandango provides Sailthru with the video title for each Video ID so that Sailthru's platform can better target Fandango's customers.

**B.    Defendant Discloses Class Members' PII To Sailthru In Order To Analyze Metrics And Maximize Advertising Revenue**

44.     Defendant transmits a user's e-mail address, AAID, location data and Video IDs so the API can analyze performance metrics for the App.

45.     Developers can also supplement Sailthru's platform with other analytics tools. Thus, the platform "can automatically pull in events captured by Adobe Analytics, Amplitude, Flurry, Google Analytics, Localytics and Mixpanel for message targeting in Carnival."[20]   The dynamic analysis found that Fandango utilizes several of these analytic tools.

46.     Sailthru's platform provides clients like Fandango with a "rich Analytics

---

[20] PRODUCT, http://web.archive.org/web/20170806153238/http://carnival.io/product/#analytics (archived: Aug. 6, 2017).

dashboards for viewing and analyzing metrics at the individual app level,"[21] along with a "Live Portfolio Dashboard" that gives clients "the most important insights aggregated across your entire app portfolio in one beautiful interface."[22]

47.     Specifically, the analytics dashboard allows clients like Fandango to (1) "[v]iew live engagement stats and where your app is being used around the world in real-time," (2) "capture[] Installs, Uninstalls, App Opens, Monthly Active Users, Location, Technology, and more," (3) "[s]ee how every piece of content performs with message impressions, app opens from push, and delivery status," and (4) "[c]apture user actions such as sign ups, screen views, and purchase, then target by these events."[23]

48.     The Live Dashboard also allows clients like Defendant to segment app users by "New Users," "Returning Users," and "Unengaged Users," which aids app-makers in marketing strategy.[24]

49.     Using the data collected by Sailthru, through the Carnival API, Defendant specifically aims content at specific types of users (*e.g.*, New Users, Returning Users, or Unengaged Users), or target users in a specific geographic region or time zone

---

[21] NEW: LIVE PORTFOLIO DASHBOARD, http://web.archive.org/web/20170727162204/http://carnival.io/mobile-insights//live-app-portfolio-dashboard/ (archived: July 27, 2017).

[22] *Id.*

[23] PRODUCT, *supra* note 21.

[24] NEW: LIVE PORTFOLIO DASHBOARD, *supra* note 22.



The data that Sailthru collects is then fed "directly into [clients'] automation and re-targeting campaigns."[25]



[25] CARNIVAL.IO, BY SAILTHRU, http://web.archive.org/web/20170814101618/http://carnival.io/index.html (archived: August 14, 2017).

50.     The following flow-chart describes this process.  First, Fandango transmits data to Sailthru through the Carnival API that Sailthru then analyzes.   After analysis, Sailthru curates messages targeting a specific subset of users, like inactive users or new users.



51.     Sailthru also develops messages for specific user events.  For instance, Defendant could use Sailthru's platform to send a push notification for movie tickets each time a user watches a particular trailer.  Sailthru provides the following illustration:



52.      Push notifications, like all Sailthru outreach, is hyper-focused on a given user.  On behalf of Defendant, Sailthru schedules notifications "based on location, behavior, and attributes," personalizes text, and showcases links to different sections of an app "to prompt user actions, such as driving to purchase"[26]:



53.      To summarize, Sailthru's Carnival API collects a significant amount of data on individuals who use the Fandango App, including who they are, where they are located, and what content they have  viewed or purchased.  Sailthru takes this data, organizes it, analyzes it, and then displays it on Sailthru's platform, which Defendant can then access.  Sailthru's product then helps Defendant  curate  and  target  its  marketing  materials,  including  through  automated  and individualized in-app messages, push notifications, and emails.

**C. Defendant Intentionally And Knowingly Discloses Its Users' PII to Sailthru Via The Carnival API**

54.      Based on the above, it is abundantly clear that Defendant ***intentionally*** and ***knowingly*** discloses to Sailthru, through its Carnival API, its users' personally identifiable information.   Indeed, Defendant is listed on Sailthru's website as an exemplar of mobile

---

[26] PRODUCT, *supra* note 21.

14

marketing.[27]

55.     Sailthru's platform provides a dashboard that transparently shows what information it is collecting, analyzing, and aggregating.  This includes what actions users have and have not taken and their engagement level with the App.  Defendant then uses the Sailthru platform to hyper-target advertisements.  By integrating the Carnival API and using Sailthru's platform, Defendant knows that it is disclosing to Sailthru its users' personally identifiable information.

## IV.    The Fandango Website:  Defendant Knowingly Discloses Users' PII Through its Website

56.     Defendant develops, owns, and operates www.fandango.com ("Fandango Website").

57.     The Fandango Website integrates the Facebook Tracking Pixel, a web beacon that Defendant uses to knowingly disclose purchasers' PII to Facebook.

### A.  The Facebook Tracking Pixel

58.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[28]  Facebook describes itself as a "real identity platform,"[29] meaning users are allowed only one account and must share "the name they go by in everyday life."[30]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[31]

---

[27] 14 INSANELY SIMPLE MOBILE MARKETING TECHNIQUES YOU CAN STEAL FROM THE FORTUNE 500, https://www.sailthru.com/marketing-blog/14-insanely-simple-mobile-marketing-techniques-can-steal-fortune-500/.

[28] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[29] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[30] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[31] FACEBOOK, SIGN UP, https://www.facebook.com/

59.     Facebook generates revenue by selling advertising space on its website.[32]

60.     Facebook sells advertising space by highlighting its ability to target users.[33] Facebook can target users so effectively because it surveils user activity both on and off its site.[34] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[35]   Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[36]

61.     Advertisers can also build "Custom Audiences."[37]   Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[38] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[39]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to

---

[32] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[33] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[34] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[35] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[36] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.
[37] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[38] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[39] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[40] One such Business Tool is the Facebook Tracking Pixel.

62.      The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[41]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

63.      Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[42]  Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[43]  An advertiser can also create their own tracking parameters by building a "custom event."[44]

64.      Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

---

[40] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[41] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[42] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[43] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[44] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

specific Data."[45]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[46]  Pixel-specific Data includes "the Pixel ID and cookie."[47]

## V.   The Fandango Website and The Facebook Tracking Pixel

65.     The Fandango Website hosts the Facebook Tracking Pixel and sends event data to Facebook.   The event data transmitted depends on whether a visitor is purchasing a ticket or watching a video clip.

### A.  Purchasing a Ticket



66.     When purchasing a movie ticket, Fandango's Website discloses three data points to Facebook: PageView, InitiateCheckOut, and Microdata.

67.     These metrics, independently and jointly, permit an ordinary person to identify a movie and the movie's title.

---

[45] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[46] *Id.*
[47] *Id.*



68.    When a visitor purchases a ticket, PageView and Microdata identifies the movie

title and the theater location.



69.    The URL redirects to the precise movie for which a visitor has purchased a ticket.

The URL shown above, for example, redirects to Jujutsu Kaisen: 0.

70.    InitiateCheckout shows the exact theater for which a viewer has purchased a ticket.



71.    All three events, independently and jointly, permit an ordinary person to identify a theater location and the movie's title.

**B.  Watching a Video Clip**



72.     When watching a video clip, Fandango's Website discloses four data points to Facebook: PageView, ViewContent, Button Click and Microdata.

73.     These metrics, independently and jointly, permit an ordinary person to identify a particular video clip and its corresponding title.

74.     Fandango, each time a consumer watches a video, discloses PageView and ViewContent, which is event data that shows the URL accessed.



75.     The URL redirects to the precise video clip the consumer has watched.  The URL shown above, for example, redirects to a trailer for the recently released blockbuster, Uncharted.



76.     Defendant also discloses event data for Microdata and Button Click, providing detailed descriptions for the video viewed along with whether the consumer clicked play or pause.

▼ ⚡ Microdata Automatically Detected

CUSTOM PARAMETERS SENT
Schema.org: []
DataLayer: []
OpenGraph:   Hide

{"og:site_name":"Fandango","og:title":"Uncharted (2022)","og:description":"Street-smart Nathan Drake (Tom Holland) is recruited by seasoned treasure hunter Victor "Sully" Sullivan (Mark Wahlberg) to recover a fortune amassed by Ferdinand Magellan and lost 500 years ago by the House of Moncada. What starts as a heist job for the duo becomes a globe-trotting, white-knuckle race to reach the prize before the ruthless Santiago Moncada (Antonio Banderas), who believes he and his family are the rightful heirs.","og:url":"https://www.fandango.com/uncharted-2022-222998/movie-overview","og:image":"https://images.fandango.com/ImageRenderer/500/0/redesign/static/img/default_poster.png/0/images/masterrepository/Fandango/222998/fmc_mc_Uncharted.jpg","og:type":"movie.details","twitter:card":"summary_large_image","twitter:site":"@Fandango","twitter:creator":"@Fandango","twitter:title":"Uncharted (2022)","twitter:description":"Street-smart Nathan Drake (Tom Holland) is recruited by seasoned treasure hunter Victor "Sully" Sullivan (Mark Wahlberg) to recover a fortune amassed by Ferdinand Magellan and lost 500 years ago by the House of Moncada. What starts as a heist job for the duo becomes a globe-trotting, white-knuckle race to reach the prize before the ruthless Santiago Moncada (Antonio Banderas), who believes he and his family are the rightful heirs.","twitter:img:src":"https://images.fandango.com/ImageRenderer/500/0/redesign/static/img/default_poster.png/0/images/masterrepository/Fandango/222998/fmc_mc_Uncharted.jpg"}

▼ ■ Button Click Automatically Detected

CUSTOM PARAMETERS SENT
formFeatures: []
buttonText:   Hide

Movie DetailsAdd to favorite moviesUNCHARTED (0)Movie RatingPG-0, 0 hr 0 min 0% 0Movie More InfoStreet-

buttonFeatures:   Hide

{"classList":"js-movie-video-section movie-detail movie-detail--desktop movie-offer-btn_wrap fd-panel","destination":"","id":"","imageUrl":"https://images.fandango.com/ImageRenderer/200/0/redesign/static/img/default_poster.png/0/images/masterrepository/Fandango/222998/PND_poster_Uncharted_InTheaters.jpg","innerText":"Movie Details\nAdd to favorite movies\nUNCHARTED (2022)\rMovie Rating\rPG-13, 1 hr 56 min\n 41%\n 90%\rMovie More Info\n\nStreet-smart Nathan Drake (Tom Holland) is recruited by seasoned treasure hunter Victor "Sully" Sullivan (Mark Wahlberg) to recover a fortune amassed by Ferdinand Magellan and lost 500 years ago by the House of Moncada. What starts as a heist job for the duo becomes a globe-trotting, white-knuckle race to reach the prize before the ruthless Santiago Moncada (Antonio Banderas), who believes he and his family are the rightful heirs. If Nate and Sully can decipher the clues and solve one of the world's oldest mysteries, they stand to find $5 billion in treasure and perhaps even Nate's long-lost brother...but only if they can learn to work together.\n\nGENRE: Action/Adventure\rRELEASE DATE: Friday, Feb 18, 2022\n VIDEOS: WATCH VIDEOS\rCAST & CREW\rNext\n Ruben Fleischer Director\n Tom Holland Nathan Drake\n Mark Wahlberg Victor Sullivan\n Tati Gabrielle Braddock\n Sophia Taylor Ali Chloe Frazer\n Antonio Banderas\n Alex Gartner Producer\n Ari Arad Producer\n Art Marcum Screenwriter\n Charles Roven Producer\n Chung Chung-Hoon Cinematographer\n Matt Holloway Screenwriter\n Rafe Judkins Screenwriter\rPHOTOS\n\nimage gallery of movie photos\nSkip the image gallery\rNext Slide\nCheck out these photos for \"Uncharted\"\n\nUncharted poster art\rMORE DETAILS","numChildButtons":27,"tag":"section"}

77.     All four events, independently and jointly, permit an ordinary person to identify a particular video's title and subject matter.

### C.  Fandango Discloses Identifying Information to Facebook

78.     Whenever a consumer purchases a movie ticket or watches a video clip, Defendant compels that consumer's browser to transmit the c_user cookie to Facebook.  The c_user cookie contains the consumer's unencrypted Facebook ID.  When purchasing the above movie ticket, for example, Fandango compelled the browser to send seven cookies to Facebook, six of which are visible here:

| c_user | 100035966074568 | .facebook.com |
| wd | 1348x959 | .facebook.com |
| xs | 39%3A9HBdzgNaZs... | .facebook.com |
| datr | Zp4zYjtbHNvg967c... | .facebook.com |
| sb | Y1QyYunv8SZyn_R2... | .facebook.com |
| presence | C%7B%22t3%22%3... | .facebook.com |
| fr | 0oL04gglaaUVD3W... | .facebook.com |

79.     Absent from this figure and the following two is the _fbp cookie, which Fandango transmits as a first-party cookie, and which contains, at a minimum, an unencrypted value that uniquely identifies a browser. [48]

80.     When a visitor's browser has recently logged out of Facebook, Defendant compels the browser to send a smaller set of cookies:

| wd | 1348x959 | .facebook.com |
| datr | Zp4zYjtbHNvg96... | .facebook.com |
| locale | en_US | .facebook.com |
| sb | Y1QyYunv8SZyn_... | .facebook.com |
| fr | 0oL04gglaaUVD3... | .facebook.com |

81.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier. [49] Facebook, at a minimum, uses the fr and _fbp cookies to identify users. [50]

82.     If a visitor has never created a Facebook account, Fandango transmits three cookies, two of which are visible here: [51]

| sb | qqAzYsNOnTC8n... | .facebook.com |
| fr | 0QDIJ8FTSrY9fxy... | .facebook.com |

---

[48] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.
[49] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[50] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[51] The _fbp cookie, visible in Figure 10, is not shown here but is still transmitted.

83.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.  Facebook uses both for targeted advertising.

84.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[52]  If that happens, the time resets, and another 90 days begins to accrue.[53]

85.     The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[54]  If that happens, the time resets, and another 90 days begins to accrue.[55]

86.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Fandango.  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[56]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

87.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

88.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

---

[52] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[53] Confirmable through developer tools.
[54] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[55] Also confirmable through developer tools.
[56] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

89.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what Fandango video a user has watched or what movie tickets have been purchased.

90.     By purchasing movie tickets, Plaintiffs and Class members are "consumers," as the VPPA defines that term.  18 U.S.C. § 2710(a)(1).

91.     By selling tickets to prerecorded movies and disseminating video clips, Fandango is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."   18 U.S.C. § 2710(a)(4).

92.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for movies and video clips, Fandango knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

93.     By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for movies and video clips, Fandango discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

94.     By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for movies and video clips, Fandango discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

95.     Facebook confirms that it matches activity on the Fandango Website with a user's profile.  Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting

their apps or websites."[57]   Here, the off-site activity report confirms Fandango identifies an individual's video viewing activities.

| ID | 384280192611758 |
|---|---|
| Event | PAGE_VIEW |
| Received on | November 24, 2021 at 2:20 PM |
| ID | 315259641998531 |
| Event | CUSTOM |
| Received on | February 24, 2021 at 4:24 PM |

96.     The "IDs" shown here are the same Facebook Pixel IDs previously visible.  The Facebook Pixel ID is a numerical code that uniquely identifies each Pixel.[58]  In practice, this means Fandango's Pixels have an ID that differ from all other websites.  All consumers who have viewed videos or purchased movie tickets from Fandango can pull their off-site activity report and see the same Pixel IDs.

**D.  Fandango Discloses This Information to Facebook Knowingly**

97.     Defendant discloses its purchasers' PII knowingly.  That is best evinced by Defendant's use of the Facebook Tracking Pixel in the first place, considering its sole purpose is to link a Facebook profile to off-Facebook activity.

---

[57] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."
[58] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

VI.     **Experiences Of Plaintiffs**

     A.     **Experience Of Plaintiff Jason Goldstein**

98.     In 2016, Plaintiff Goldstein downloaded the Fandango App on his iPhone.

99.     In 2008, Plaintiff Goldstein created a Facebook account.

100.    When Plaintiff Goldstein set up the Fandango App, he created an account and enabled geolocation services.

101.    Plaintiff Goldstein used the Fandango App and the Fandango Website through March 2020 in the state of Florida.  During that time, Plaintiff Goldstein used the Fandango App and Fandango Website to watch video clips and purchase movie tickets, including a movie ticket purchase on March 7, 2020.

102.    At all times relevant, Plaintiff Goldstein never consented, agreed, or otherwise permitted Defendant to disclose his personally identifiable information while purchasing movie tickets or watching video clips.

103.    Nevertheless, each time Plaintiff Goldstein watched videos or purchased movie tickets, Defendant disclosed his personally identifiable information to third parties like Sailthru and Facebook.  Using this information, the recipients could identify Plaintiff Goldstein and link his identity to his video viewing records.

     B.     **Experience Of Plaintiff Tammy Huttemeyer**

104.    In late 2020, Plaintiff Huttemeyer downloaded the Fandango App on her Android phone.

105.    In 2011, Plaintiff Huttemeyer created a Facebook account.

106.    When Plaintiff Huttemeyer set up the Fandango App, she created an account and enabled geolocation services.

107.    Plaintiff Huttemeyer used the Fandango App and the Fandango Website through

March 2021 in the state of Florida.  During that time, Plaintiff Huttemeyer used the Fandango App and Fandango Website to watch video clips and purchase movie tickets, including a movie ticket purchase on October 11, 2020.

108.    At all times relevant, Plaintiff Huttemeyer never consented, agreed, or otherwise permitted Defendant to disclose her personally identifiable information while purchasing movie tickets or watching video clips.

109.    Nevertheless, each time Plaintiff Huttemeyer watched videos or purchased movie tickets, Defendant disclosed her personally identifiable information to third parties like Facebook and Sailthru.  Using this information, the recipients could identify Plaintiff Huttemeyer and link her identity to her video viewing records.

## PARTIES

110.    Plaintiff Jason Goldstein is, and has been at all relevant times, a resident of Delray, Florida and has an intent to remain there, and is therefore a domiciliary of Florida.

111.    Plaintiff Tammy Huttemeyer is, and has been at all relevant times, a resident of Fort Pierce, Florida and has an intent to remain there, and is therefore a domiciliary of Florida.

112.    Defendant Fandango Media LLC is a Virginia corporation with its principal place of business at 407 N. Maple Drive, Beverly Hills, California 90210.  Defendant develops, owns, and operates the Fandango App and the Fandango Website, which is used throughout Florida and the United States.

## JURISDICTION AND VENUE

113.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

114.    This Court also has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

115.    This Court has personal jurisdiction over Defendant because the Fandango App and Fandango Website collected and disseminated the personally identifiable information giving rise to this lawsuit in this District.

116.    Defendant is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant is therefore "a citizen of the State where it has its principal place of business [California] and the State under whose laws it is organized [Virginia]." *See* 28 U.S.C. § 1332(d)(10).

117.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

118.    **Class Definition:**  Plaintiffs Huttemeyer and Goldstein seek to represent a class of similarly situated individuals defined as all persons in the United States who purchased movie tickets from Defendant (the "Movie Ticket Class").

119.    Plaintiffs Huttemeyer and Goldstein also seek to represent a class of similarly situated individuals defined as all persons in the United States who viewed video clips on Defendant's website or mobile application (the "Movie Clip Class").

120.    Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

121.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the

exact number of members of the aforementioned Classes.  However, given the popularity of Fandango, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

122. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant collected Plaintiffs' and the Classes' PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiffs' and the Classes' PII without consent.

123. **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, used the Fandango App and/or the Fandango Website to purchase movie tickets or watched video clips and had their PII collected and disclosed by Defendant.

124. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the

Classes, and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

125.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710, *et seq.*

126.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

127.     Defendant is a "video tape service provider" because it disseminates video clips and sells movie tickets to its users through the Fandango App and the Fandango Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

128.     Plaintiffs are "consumers" because they accessed the Fandango App and the

Fandango Website and purchased movie tickets through those platforms.  18 U.S.C. § 2710(a)(1).  That makes them "purchaser[s]," and thus, under the VPPA, they are "consumers."  18 U.S.C. § 2710(a)(1).

129.    Defendant disclosed to third parties, like Sailthru and Facebook, the personally identifiable information of Plaintiffs and members of the Classes.   Defendant transmitted Plaintiffs' and the Class members' Facebook ID, AAIDs, email addresses, location data, and other identifiers.  These identifiers, when combined with event data or the Video ID, sufficiently permit an ordinary person to identify a specific individual's video viewing behavior.

130.    An email address sufficiently permits an ordinary person to identify a specific individual, and this is especially true when paired with location data and an AAID.

131.    A Facebook ID and Facebook's other identifiers sufficiently permit an ordinary person to identify a specific individual.

132.    A Video ID sufficiently permits an ordinary person to identify the specific video material obtained.

133.    And event data from the Facebook Tracking Pixel sufficiently permits an ordinary person to identify the specific video material obtained.

134.    Defendant transmitted each class member's email address, AAID, location data and Video ID together, which Sailthru collected and then compiled into an individual profile so Fandango could better personalize advertisements.

135.    Defendant also transmitted event data alongside Facebook's identifiers, allowing it to better target advertisements.

136.    Accordingly, Defendant transmitted to a third party information sufficient to permit an ordinary person to identify a specific individual's video watching behavior.

137.    Defendant transmitted this PII knowingly.  For the Fandango App, Sailthru's marketing materials and dashboard transparently show that Sailthru collects, analyzes, and aggregates email addresses, location data, and purchase history.  By using Sailthru's platform, Fandango understood it was disclosing its consumers' PII.   And for the Fandango Website, Defendant must use the Custom Audiences that Facebook creates in order to target its advertisements.  By doing so, Defendant understood it was disclosing its consumers' PII.

138.    Plaintiffs and Class members used the Fandango App and Fandango Website to purchase movie tickets and watch video clips.  When they did so, Defendant knowingly disclosed Plaintiffs' and the Class members' PII to third parties like Sailthru and Facebook.

139.    Plaintiffs and members of the Classes did not provide Defendant with any form of consent—either written or otherwise—allowing it to disclose their PII to third parties.

140.    On behalf of themselves and the Classes, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced

herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    An award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 11, 2022

Respectfully submitted,

By: */s/ Christopher R. Reilly*
      Christopher R. Reilly

**BURSOR & FISHER, P.A.**
Christopher R. Reilly (SBN 1025097)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail:  creilly@bursor.com

*Counsel for Plaintiffs*

34