## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-80569-CIV-MARRA

JASON GOLDSTEIN and TAMMY
HUTTEMEYER, individually and on
behalf of all others similarly situated,

   Plaintiffs,

vs.

FANDANGO MEDIA, LLC,

   Defendant.

_____/

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## <u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>

Dated: July 11, 2022

        **BURSOR & FISHER, P.A.**
        Christopher R. Reilly (SBN 1025097)
        701 Brickell Avenue, Suite 1420
        Miami, FL 33131
        Telephone: (305) 330-5512
        Facsimile: (305) 676-9006
        E-Mail: creilly@bursor.com

        *Attorney for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

PAGE(S)

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ......................................... 2

    A.  By Delivering Video Clips, Defendant Is A Video Tape Service Provider............ 3

        1.    Video Clips Constitute Audio Visual Material ............................................. 3

            i.   Liability Under The VPPA Does Not Hinge On The Subject
                Matter Of The Video................................................................... 3

            ii.  The First Amendment Compels The Court To Reject Defendant's
                Content-Based Interpretation Of The VPPA ............................. 4

        2.    Defendant is Engaged in the Business of Delivering the Video Clips .......... 7

    B.  By Selling Movie Tickets, Defendant is a Video Tape Service Provider............... 9

        1.    Movies and Films Constitute Audio Visual Materials.................................... 9

        2.    Defendant Is Engaged In The Business Of Delivering Audio
            Visual Materials ......................................................................................... 11

II.    DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE
     INFORMATION TO SAILTHRU AND FACEBOOK.............................................. 12

    A.  Defendant Does Not Dispute The Sufficiency Of The PII It Transmits
       To Sailthru To Identify Class Members That Used The Fandango App ............. 12

    B.  Defendant Transmits PII Sufficient To Identify Class Members Using
       Its Website To Facebook ..................................................................................... 12

III.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE
     INFORMATION KNOWINGLY ............................................................................... 15

CONCLUSION........................................................................................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

CASES

*Arkansas Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ........................................................................................................... 7

*Bamon Corp. v. City of Dayton*,
730 F. Supp. 80 (S.D. Ohio 1990) ................................................................................. 11

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ............................................................. 3

*Clark v. Martinez*,
543 U.S. 371 (2005) ........................................................................................................... 4

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
406 F. Supp. 3d 1258 (M.D. Ala. 2019) ....................................................................... 5

*Crowell v. Benson*,
285 U.S. 22 (1932) ............................................................................................................. 4

*Dixon v. Sony Corp. of America*,
2012 WL 1886550 (S.D. Fla. May 23, 2012) ............................................................. 9

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....................................................................................... 13

*Ellis v. Cartoon Network, Inc.*,
2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ............................................................... 12

*Enslin v. The Coca-Cola Co.*,
136 F. Supp. 3d 654 (E.D. Pa. 2015) ......................................................................... 16

*Gonzalez v. Central Elec. Co-op, Inc.*,
2009 WL 3415235 (D. Or. Oct. 15, 2009) ........................................................... 10, 11

*In re Facebook, Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) .................................................................................. 14, 15

*In re Facebook, Inc., Cons. Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ...................................................................... 7, 8

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
806 F.3d 125 (3d Cir. 2015) ......................................................................................... 14

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ................................................ 12, 14

*In re Hulu Privacy Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ................................................ 10, 15

*In re Hulu Privacy Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................................. 15

*In re Nickelodeon Consumer Priv. Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014)............................................................. 12

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016)................................................................................. 14

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) .................................................................................... 14

*In re Vizio, Inc., Consumer Privacy Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. Mar. 2, 2017)............................................ *passim*

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018)............................................................................................. 4

*Locklear v. Dow Jones &* Co., Inc.,
ocklear v. Dow Jones & Co., Inc., 1*01 F. Supp. 3d 1312 (N.D.* Ga. *2015)* ............................ 14

*McCrohan v. Sandulli Grace, P.C.*,
369 F. Supp. 3d 324 (D. Mass. 2019) .................................................................. 16

*Mollet v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ............................................................................. 11

*National Institute of Family and Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018)........................................................................................... 5

*Perry v. Cable News Network, Inc.*,
2016 WL 4373708 n.7 (N.D. Ga. Apr. 20, 2016) ............................................... 14

*Pincus v. Law Offices of Erskine & Fleisher*,
2010 WL 286790 n.1 (S.D. Fla. Jan. 19, 2010) .................................................. 12

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377 (1992)............................................................................................... 5

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)............................................................................................... 5

*Regan v. Time, Inc.*,
  468 U.S. 641 (1984) ........................................................................................... 5, 6

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015) ............................................................... 12, 14

*Senne v. Village of Paletine, Ill.*,
  695 F. 3d 597 (7th Cir. 2012) ............................................................................ 15

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ........................................................................... 4

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
  502 U.S. 105 (1991) ........................................................................................... 6, 7

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................................... 15

*St. George v. Pinellas County*,
  285 F.3d 1334 (11th Cir. 2002) ......................................................................... 9

*United States v. Hastie*,
  854 F.3d 1298 (11th Cir. 2017) ......................................................................... 13

*United States v. Szymuskiewicz*,
  622 F.3d 701 (7th Cir. 2010) ............................................................................ 14

*Yershov v. Gannet Satellite Info. Network, Inc.*,
  204 F. Supp. 3d 353 (D. Mass. 2016) ............................................................... 3

*Yershov v. Gannett Satellite Information Network, Inc.*,
  820 F.3d 482 (1st Cir. 2016) ............................................................................. 1

## STATUTES

18 U.S.C. § 2710 .................................................................................................... 1, 2, 11

20 U.S.C. § 1687 .................................................................................................... 8

29 U.S.C. § 213 ..................................................................................................... 8

## RULES

Fed. R. Civ. P. 8 .................................................................................................... 16

Fed. R. Civ. P. 9 .................................................................................................... 16

**OTHER AUTHORITIES**

S. Rep. 100-599................................................................................................................... *passim*

## INTRODUCTION

> [A]s we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy. The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. Those records are a window into our loves, likes, and dislikes.

S. Rep. 100-599, at 7-8 (1988) (remarks by Senator Paul Simon). Much has changed since 1988. Computing technology has grown exponentially, ushering in a new economy where billions— sometimes trillions—of dollars stand to be gained by collecting and dissecting personal information. Everyone participates, from newspapers to retail stores to movie ticket sellers. But while this surveillance economy has blossomed and flourished, the words spoken by Senator Simon still ring loud. At its most basic level, Plaintiffs' complaint asks whether the principles spoken by Senator Simon—that we must "protect time honored values that are central to this society, particularly our right to privacy"—remain implacable.

When first enacted, the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), was the latest in "a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599, at 2. Congress passed the VPPA with the goal of "preserv[ing] personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at 1. To that end, Congress "created a civil remedy against a 'video tape service provider' for 'knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider.'" *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)). Defendant Fandango is one such "video tape service provider."

Defendant "develops, owns, and operates a website and mobile application, both titled 'Fandango,'" where Defendant "sells tickets to movies" and "hosts and delivers thousands of movie trailers, interviews, select scenes, and premiere videos." First Amended Complaint (ECF No. 8) (the "FAC") ¶¶ 2, 11-12. On both its website and mobile application ("Fandango Website" and "Fandango App"), Defendant "disclosed to third parties … the personally identifiable information of Plaintiffs and members of the Classes." *Id.* ¶ 143. The Fandango App "integrates the Carnival Marketing API (the 'Carnival API'), which is owned by Sailthru, Inc. ('Sailthru')," while the Fandango Website "hosts the Facebook Tracking Pixel and sends event data to

Facebook." *Id.* ¶¶ 21, 70. "Sailthru's platform has three distinct functions": "collect[ing] and analyz[ing] user data"; "develop[ing] hyper-personalized content for each user"; and "allow[ing] marketers, like Defendant, to coordinate and send this content through push notifications, email blasts, and in-app solicitations." *Id.* ¶ 28. And Facebook "is the largest social networking site on the planet," which Defendant uses "to better target advertisements." *Id.* ¶¶ 63, 149.

When a consumer watches a video on the Fandango App, "Defendant discloses that consumer's e-mail address, advertising ID, and the Video ID to Sailthru via the Carnival API." *Id.* ¶ 34. As for the Fandango Website, "[t]he event data transmitted depends on whether a visitor is purchasing a ticket or watching a video clip." *Id.* ¶ 70. When a consumer purchases a movie ticket, Defendant discloses data "permit[ing] an ordinary person to identify a theater location and the movie's title." *Id.* ¶ 75. When a consumer watches a video clip, Defendant discloses data "permit[ing] an ordinary person to identify a particular video's title and subject matter." *Id.* ¶ 82. When a consumer does either on the Fandango Website, "Defendant compels [a] consumer's browser to transmit the c_user cookie to Facebook," which contains that consumer's "unencrypted Facebook ID." *Id.* ¶ 83. "Defendant also discloses an account-holder's email address." *Id.* ¶ 94. Defendant thus "knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior," *see id.* ¶ 106, violating the VPPA.

Defendant has no compelling defense. *First*, Defendant is a "video tape service provider" because it delivers video clips and sells movie tickets. *Id.* ¶¶ 11-12. *Second*, Defendant discloses personally identifiable information ("PII") by transmitting users' email addresses, Facebook IDs, Advertising IDs, Video IDs, event data, and other identifiers. *See id.* ¶¶ 34, 105-109. *Third*, by using the third parties' services in the first place, Defendant knowingly discloses this PII. Accordingly, Defendant's Motion to Dismiss (the "MTD" or "Motion") should be denied in full.

## ARGUMENT

## I.   DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

The VPPA broadly defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Defendant fits within that definition under two distinct theories. *First*, Defendant "delivers thousands of movie trailers, interviews, select scenes, and premiere videos" on its app and website. FAC ¶ 12. *Second*, Defendant "sells tickets to movies and contracts directly with more than 40,000 theaters

worldwide, serving as a substitute for a theater's box office."  *Id.* ¶ 11.

> **A.      By Delivering Video Clips, Defendant Is A Video Tape Service Provider**
>
> **1.      <u>Video Clips Constitute Audio Visual Material</u>**

Defendant argues that video clips are not "similar audio visual material" because "[that] would mean that any website that includes any video on any topic is subject to the VPPA."  MTD at 13.  This argument should be rejected because it lacks textual support, undermines the legislative intent, and raises serious constitutional concerns.

> *i.      Liability Under The VPPA Does Not Hinge On The Subject Matter Of The Video*

Contrary to Defendant's arguments, "audio visual material," as that term is used in the VPPA, includes video clips on websites.  There is no indication in the statutory text, case law, or legislative history that Congress intended that term to only apply to videos pertaining to certain "topics."  Defendant cites no authority to support its argument that the VPPA is only meant to address certain types of videos, and its briefing does not even attempt to articulate which "topics" or formats it believes are subject to the VPPA and which are not.  By contrast, case law has found that the VPPA applies to "video clips on various news, sports, and entertainment topics."  *Yershov v. Gannet Satellite Info. Network, Inc.*, 204 F. Supp. 3d 353, 354 (D. Mass. 2016).  Courts have even held that the VPPA applies to "video games."  *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *1 (N.D. Cal. Apr. 5, 2019).  Further, the legislative history contemplates that the VPPA would apply to a diversity of video content, like "golf videos." S. Rep. 100-599, at 13.  And applying the VPPA in this manner comports with its policy objectives, as the video clips a consumer watches in 2022 are just as much of "a window into [a consumer's] loves, likes, and dislikes" as the movies consumers chose to rent in 1988.  *Id.* at 7-8.  Arguably, video clips today convey a person's likes and dislikes more so than movie rentals in 1988 because companies like Defendant work with third parties like Sailthru and Facebook—who in turn use technology and data that simply wasn't available in 1988—to market specific goods and advertisements to consumers based on which video clips are watched.  FAC ¶¶ 48-58, 60, 65-69.  To put it simply, there is no indication whatsoever that liability under the VPPA is limited to only certain types of audio visual materials.

Defendant tries to march out a parade of horribles by arguing that a contrary interpretation of the VPPA would expose "tool company websites containing how-to videos for the products they sell, hotel websites with videos showcasing the amenities they offer, realtor websites offering virtual home tours, and travel organizations showing videos of travel destinations" to liability

under the VPPA.  MTD at 13.  But the fact that the VPPA governs these videos does not mean that websites are prohibited from displaying them.  Instead, it simply means that these websites are not permitted to tell third parties who the viewers are and what they watched without the viewer's consent, as Defendant has done for pecuniary gain in this case.  And getting a consumer's consent "is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016).  Because of this, Defendant's suggestion that this Court could be violating the VPPA because it posts juror-facing videos on its website—notably, without claiming the Court sells that information and other identifiers to third parties for marketing purposes like Defendant does—is meritless.  MTD at 13.

Defendant's argument was also rejected by another court in the Central District of California.  *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1222 (C.D. Cal. Mar. 2, 2017) ("*In re Vizio*").  There, defendants "argu[ed] that if Vizio is considered a video tape service provider, countless products and services[] … would also fall within the statutory definition of video tape service providers." *Id.* (internal quotations omitted, cleaned up).  As the court reasoned, however, to be a video tape service provider, an entity must engage in "the business' of delivering video content," and there are "[o]ther textual limitations that further cabin the scope of the Act," like its applicability only to "consumers," and how liability only extends to those that "release[] personally identifiable information without the consent of the consumer." *Id.* (internal quotations omitted).  Here, as in *In re Vizio*, Defendant's "policy-laden argument cannot overcome the statute's plain meaning." *Id.*

ii.     The First Amendment Compels The Court To Reject Defendant's Content-Based Interpretation Of The VPPA

Defendant's argument also depends on a statutory interpretation that, if accepted, would raise significant constitutional problems under the First Amendment because it suggests that the VPPA governs videos concerning some topics by not others.  That construction should be avoided.

"When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  This tool of construction, known as the canon of constitutional avoidance, "rest[s] on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S.

371, 381 (2005). That canon applies whenever an offered interpretation "would raise serious constitutional problems under the First Amendment." *Coral Ridge Ministries Media, Inc. v. Amazon.com*, *Inc.*, 406 F. Supp. 3d 1258, 1303 (M.D. Ala. 2019).

The First Amendment "prohibits laws that abridge the freedom of speech." *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). "When enforcing this prohibition, [the Supreme Court's] precedents distinguish between content-based and content-neutral regulations of speech." *Id.* "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984). Outside of a few well-defined categories of speech, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 377 (1992) ("A few limited categories of speech, such as obscenity, defamation, and fighting words, may be regulated *because of their constitutionally proscribable content*.") (emphasis in original). "[S]peech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 171. A speech regulation is still content based "even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169.

Defendant interprets the VPPA as only applying to content that is "similar" to the full-length movies Judge Bork watched. Defendant argues that, as opposed to "a person's video rentals," the VPPA cannot apply to "movie trailers and … video clips" because those videos are "not what Congress intended when it enacted the VPPA, as evidenced by including only videotapes and 'similar audio visual materials.'" MTD at 13. Defendant further claims that "[f]inding that Fandango's inclusion of trailers and other … videos on its website converts it into video tape service provider would mean that any website that includes any video on any topic is subject to the VPPA." *Id.* Put differently, under Defendant's interpretation, whether an entity constitutes a video tape service provider depends on the content—or, as Defendant puts it, "topics"—of the videos they sell, rent, or deliver. The VPPA would regulate an entity that delivers *The Star Chamber*, for example, but not when that same entity delivers "videos of travel destinations." *See id.* This content-based dichotomy would also apply to consumers: the VPPA would protect consumers PII when renting *The Star Chamber*, but not when viewing travel videos.

As the Supreme Court has held in analogous circumstances, such a content-based approach is antithetical to the First Amendment. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105 (1991). In *Simon & Schuster*, the Court reviewed the Son of Sam law, a New York state statute that "require[d] any entity contracting with an accused or convicted person for a depiction of the crime to submit a copy of the contract to respondent New York State Crime Victims Board, and to turn over any income under that contract to the Board." *Id.* at 109. In 1981, an "admitted organized crime figure," Henry Hill, "entered into a contract with author Nicholas Pileggi for the production of a book about Hill's life." *Id.* at 112. A month later, "Hill and Pileggi signed a publishing agreement with Simon & Schuster, Inc." *Id.* The Board soon discovered the contract and determined that "all money owed to Hill under the contract had to be turned over to the Board to be held in escrow for the victims of Hill's crimes." *Id.* at 113–15. The Board argued, among other things, that the statute was "content-neutral because it imposes a general burden on any 'entity' contracting with a convicted person to transmit that person's speech." *Id.* at 117. The Supreme Court rejected that argument, however, holding the Son of Sam law was "a content-based statute" that presumptively violated the First Amendment because it "single[d] out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content." *Id.* at 116. The Court also observed that, "[w]hether the First Amendment 'speaker' is considered to be Henry Hill, whose income the statute places in escrow, because of the story he has told, or Simon & Schuster, which can publish books about crime with the assistance of only those criminals willing to forgo remuneration for at least five years, the statute plainly imposes a financial disincentive only on speech of a particular content." *Id.* at 116.

Here, as in *Simon & Schuster*, Defendant presents an interpretation that imposes a "disincentive only on speech of a particular content." *Id.* at 116. To be sure, in *Simon & Schuster*, the Supreme Court reviewed a financial disincentive, which is a burden that especially "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Id.* But this notion, the Supreme Court observed, rests on "a far broader principle: 'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'" *Id.* (quoting *Regan*, 468 U.S. at 648-49). And using Defendant's interpretation, the VPPA's application—and the corresponding need for video tape service providers to comply with that statute—would hinge on the underlying

6

video's "topic." That proposed regulation, as in *Simon & Schuster*, would disincentive speech only of particular content, rendering the VPPA "presumptively inconsistent with the First Amendment," and triggering a strict scrutiny analysis. *Id.* at 115; *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) ("[O]fficial scrutiny of the content of the publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press."). Such an interpretation cannot and should not be sustained.

2.   **Defendant is Engaged in the Business of Delivering the Video Clips**

Defendant argues that it is not "engaged in the business" of delivering video clips because those videos only "promote the business in which it *is* engaged: selling movie tickets." MTD at 14 (emphasis in original). That is wrong.

The term "'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the defendant's work." *In re Vizio*, 238 F. Supp. 3d at 1221. "[F]or the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Id.* If an entity "'regularly delivers' video content to users and maintains a cache of videos and visual materials," then it is "plausible to conclude" that the entity "engages in the business of delivering audio visual materials, and that its business is 'significantly tailored to serve that purpose.'" *In re Facebook, Inc., Cons. Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019). And "[u]nder this definition, a defendant can be 'engaged in the business' of delivering video content even if other actors *also* take part in the delivery of the same video content." *In re Vizio*, 238 F. Supp. 3d at 1221 (emphasis in original).

*In re Vizio* is instructive. There, the court correctly articulated what the words "engaged in the business" is truly meant to limit:

> Take, for instance, a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox. No person is more obviously "delivering" a video tape to a consumer than this employee. Yet, the letter carrier could not be characterized as "engaged *in the business*" of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package. In the same way, the developers of many other products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definitions of a video tape service provider.

*In re Vizio*, 238 F. Supp. 3d at 1221-22 (emphasis in original).

As the FAC demonstrates, Defendant is no letter carrier.  Rather, Defendant "delivers thousands of movie trailers, interviews, select scenes, and premiere videos."  FAC ¶ 12.  That allegation plainly supports the inference that Defendant "'regularly delivers' video content to users and maintains a cache of videos and visual materials … for their delivery to users."  *See In re Facebook, Inc., Cons. Privacy User Profile Litig.*, 402 F. Supp. 3d at 799.  Delivering these videos, therefore, is necessarily "a focus of the defendant's work."  *See In re Vizio*, 238 F. Supp. 3d at 1221.  And Plaintiffs' proposed Second Amended Complaint removes any doubt about whether Defendant engages in the business of delivering video clips by alleging that "Defendant's video clips are integral to its business model."  *See* Proposed Second Amended Complaint (ECF 11-1) (the "SAC") ¶ 15.  While Defendant may not sell a movie ticket every day, it "still gains substantial pecuniary benefits by leveraging its video clips for advertising revenue."  *Id.* ¶ 17.  Defendant does this by "serv[ing] advertisements both alongside the video clips and before the content is played."  *Id.*  At the pleading stage, these allegations establish beyond doubt that the Fandango Website and App are "substantially involved in the conveyance of video content to consumers" and "significantly tailored to serve that purpose."  *See In re Vizio*, 238 F. Supp. 3d at 1221.

Defendant's refutations are unpersuasive.  In its briefing, Defendant misquotes *In re Vizio* twice.  *Compare* MTD at 14 (quoting *In re Vizio* as defining "business" as "*the* focus of the defendant's work" (emphasis added)), *with In re Vizio*, 238 F. Supp. 3d at 1221 (defining "business" as "'a particular field of endeavor,' *i.e.*, *a* focus of the defendant's work" (emphasis added)).[1]  Had Congress sought to create a more stringent standard—"the focus" as opposed to "a focus"—it would have modified "engaged in the business" with words like "primarily" or "principally," precisely as it has done with other statutes.  *See* 29 U.S.C. § 213(b)(10)(B) (exempting salesmen who are employed "by a nonmanufacturing *primarily engaged in the business* of selling trailers, boats, or aircrafts to ultimate purchasers") (emphasis added); 20 U.S.C. § 1687(3)(A)(ii) defining "program" as corporate entities that "*principally engaged in the business* of providing education, health care, housing, social services, or parks and recreation") (emphasis added).  Instead, Congress intended the statute to cover a variety of entities, ranging from "department store[s]" to "golf shop[s]" to "continuity club[s]."  *See* S. Rep. 100-599, at 12-13.

Defendant's arguments also fail to address the actual allegations in the FAC.  Rather than

---

[1] Indeed, the phrase "*the* focus of the defendant's work" does not appear *at all* in the *In re Vizio* opinion.

accept Plaintiffs' allegations as pled, Defendant recasts the video clips as "promotional videos," "promotional video clips," "video promos," and "video clip[s] promoting the sale of a good or service." MTD at 12-13. These mischaracterizations run far afield from the FAC, which alleges those video clips showcase "movie trailers, interviews, select scenes, and premiere videos." FAC ¶ 12. These videos are a stand-alone product, and as the SAC alleges, Defendant "gains substantial pecuniary benefits by leveraging the video clips for advertising revenue." SAC ¶ 17; *see also id.* ¶ 16. Because this is a motion to dismiss, "[t]he scope of review must be limited to the four corners of the complaint." *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002). If Defendant wishes to make its own allegations and its own characterizations, it can simply file an answer to the FAC. *See Dixon v. Sony Corp. of America*, 2012 WL 1886550, at *3 (S.D. Fla. May 23, 2012) ("[I]n the event that Defendant should move to dismiss the complaint, Defendant should refrain from making arguments that go beyond the pleadings.") (Marra, J.).

**B.     By Selling Movie Tickets, Defendant is a Video Tape Service Provider**

**1.     <u>Movies and Films Constitute Audio Visual Materials</u>**

Defendant contends that "movie theater screenings to which Fandango sells admissions are not similar to 'prerecorded video cassette tapes' like the ones Judge Bork rented from his local video store to take home and watch privately." MTD at 9. Neither the VPPA's statutory text nor the legislative history support that contention.

As an initial matter, if an entity makes video content available for viewing, then it necessarily delivers audio visual material, whether the letter carrier mailing *The Star Chamber*,[2] a smart TV displaying *Succession*, or a movie theater playing *Jurassic World*. *See* S. Rep. 100-599, at 12 (identifying "open reel movies" as an example of audio visual materials); *see also In re Vizio*, 238 F. Supp. 3d at 1221 ("Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is medium neutral; the defendant must be in the business of delivering content, but that content *need not be in a particular format*.") (emphasis added). This interpretation comports with the Senate Report, which "confirms that Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business

---

[2] Once again, as for the letter carrier, "no person is more obviously 'delivering' a video tape to a consumer than this employee." *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221. The difference between the letter carrier and Defendant is that the former "could not be characterized as 'engaged *in the business*' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package." *Id.*

model or media format involved." *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012) ("*In re Hulu I*").

Moreover, "Congress's use of a disjunctive list (*i.e.*, 'engaged in the business … of … rental, sale, *or* delivery') indicates that Congress intended to cover more than just the local video rental store." *In re Vizio*, 238 F. Supp. 3d at 1221. Dictionary definitions, which at least one court has found persuasive, reinforce this understanding. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2001)[3] (defining "materials" as "[t]ext or images in printed or electronic form"); *id.* (defining "audio-visual" as "[o]f, relating to, or involving both sight and sound"); *id.* (defining "delivery" as "[t]he action of conveying and handing over something"); *see also In re Hulu I*, 2012 WL 3282960, at *5 (describing the definition of "materials" as "comport[ing] with the court's ordinary sense of the definition of audio visual materials").

Further, Plaintiffs allege that Defendant "sells tickets to movies and contracts directly with more than 40,000 theaters worldwide, serving as a substitute for a theater's box office." FAC ¶ 11. Defendant concedes this point, admitting that "Fandango is simply an online version of that same box office worker—selling tickets for theatrical screenings under contracts with the theaters' operators." MTD at 12. By selling "a ticket for admission to watch a movie at a theater," *see* MTD at 8, Defendant is engaged in the business of delivering audio visual material. *See In re Vizio*, 238 F. Supp. 3d at 1221 ("[L]est the word 'delivery' be superfluous, a person need not be in the business of either renting or selling video content for the statute to apply."); *Gonzalez v. Central Elec. Co-op, Inc.*, 2009 WL 3415235, at *9 (D. Or. Oct. 15, 2009) (suggesting the VPPA applies to a hotel's disclosure of "movies available to purchase for viewing in hotel rooms").

Defendant's assertions to the contrary are unconvincing. Defendant primarily focuses on the definition of "similar," arguing that "[m]ovie theater screenings" are not "'nearly corresponding,' 'resembling in many respects,' or 'comparable' to prerecorded videotapes." MTD at 9. Defendant uses Judge Bork as an example, pointing out that, when he rented a video, "[h]e could start watching at any time, pause it when he liked, adjust the volume, repeat a scene if he missed some dialogue, and skip past parts he found boring." *Id.* If Judge Bork purchased a movie ticket for that same film, Defendant reasons, "he would have been able to watch the movie exactly once—and only if he arrived at a specific time." *Id.* This line of thought has nothing to do with

---

[3] Available online at https://www.oed.com/view/Entry/322543?redirectedFrom=audiovisual#eid.

the audio visual material at issue, and it has everything to do with the basic difference between selling, renting, and delivering that material.  If Judge Bork purchased a movie, for example, he could watch it *ad infintum*, but if he rented that same movie, he could only watch it "during the rental term."  *See id.*  That difference is irrelevant to whether the movie constitutes audio visual material.

Defendant relatedly argues that "similar" means audio visual material akin to "video tapes Judge Bork watched for private home-viewing," not "the public movie screenings he could have attended that year."  *Id.* at 9-10.  Once again, whether viewed publicly and privately, a film still constitutes audio visual material.  Nonetheless, Defendant argues that "[t]he distinction between viewing movies at home … and viewing them in public permeates the VPPA's legislative history."  *Id.* at 10.  That assertion, however, "misconstrues the nature of the disclosure which the Act regulates."  *Bamon Corp. v. City of Dayton*, 730 F. Supp. 80, 91 (S.D. Ohio 1990).  The VPPA protects from disclosure "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(4).  The VPPA is implicated, therefore, when consumers "request[] or "obtain[]" a video, not when they watch it.  *See Bamon Corp.*, 730 F. Supp. at 91 (recognizing that, "[a]s the legislative history makes clear, the Act was intended to prohibit, except in limited circumstances, the disclosure to public or private entities of *records* (or information derived from those records) kept by video tape service providers" (emphasis in the original)).  To use Defendant's analogy, when Judge Bork "requested" or "obtained" movies, he did it at the video store—*i.e.*, "in the 'public eye.'"  *See* MTD at 11.  It matters nothing whether or where he later watched those videos.  *See Mollet v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) ("The fact that a subscriber may permit third parties to access her account, thereby allowing third parties to view Netflix's disclosures, does not alter the legal status of those disclosures").

## 2. Defendant Is Engaged In The Business Of Delivering Audio Visual Materials

Defendant argues that even if movies constitute audio visual materials, it still does not "engage in the business" of delivering them because "selling tickets to a theatrical movie screening differs from renting, selling, or delivering records of the movies themselves."  MTD at 14.  But the relevant caselaw says the opposite: "a defendant can be 'engaged in the business' of delivering video content even if other actors *also* take part in the delivery of the same video content."  *In re Vizio*, 238 F. Supp. 3d at 1221.  As Defendant concedes, "Fandango is simply an online version of

… [a] box office worker—selling tickets for theatrical screenings under contracts with the theaters' operators."  MTD at 12.  That is enough to show that Defendant is engaged in the business of delivering the audio visual materials.

## II.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION TO SAILTHRU AND FACEBOOK

### A.   Defendant Does Not Dispute The Sufficiency Of The PII It Transmits To Sailthru To Identify Class Members That Used The Fandango App

Defendant argues that Plaintiffs' allegations fail "because none of the disclosures about which they complain satisfies the statutory definition of PII."  *Id.* at 14.  As an initial matter, Defendant only raises this argument with regard to disclosure of PII for its website's users to Facebook.  Defendant makes no arguments whatsoever regarding the disclosure of PII for Fandango App users to Sailthru.  Any argument regarding the adequacy of the PII for those Class Members cannot be raised on reply.  *Pincus v. Law Offices of Erskine & Fleisher*, 2010 WL 286790, at *2 n.1 (S.D. Fla. Jan. 19, 2010) (Marra, J.) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.")

### B.   Defendant Transmits PII Sufficient To Identify Class Members Using Its Website To Facebook

Defendant's arguments regarding its disclosures to Facebook are also incorrect.  As Plaintiffs allege, Defendant transmits to Facebook "cookies to link to Facebook ID and corresponding Facebook profiles" of Class Members.  FAC ¶ 92.  "Defendant also discloses an account-holder's email address*." Id.* ¶ 94.

Both Facebook IDs and email addresses are sufficient means of identifying persons. "[D]isclosure of a Facebook ID, which can identify a specific person without any additional steps, does qualify as personally identifiable information."  *Ellis v. Cartoon Network, Inc.*, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014); *see also Robinson v. Disney Online,* 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID, as the *Hulu* court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier."); *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *12 (D.N.J. July 2, 2014) ("Simply put, in a socially networked world, a Facebook ID is at least arguably 'akin' to an actual name that serves without more to identify an actual person."); *In re Hulu Priv. Litig.*, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ("*In re Hulu II*") ("The Facebook User ID is more than a unique, anonymous identifier.  It personally identifies a Facebook user.").  Moreover, "[e]mail addresses fall within the ordinary meaning of information

identifies an individual." *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual.").

Defendant does not dispute the sufficiency of Facebook IDs and email addresses as means of identifying class members. Rather, it challenges the accuracy of Plaintiffs' allegations. Defendant trains its criticism on an "image of a line of code," arguing "Plaintiffs do[] not try to explain how this line of code shows Fandango is sharing users' email addresses (or other identifiers) with Facebook." MTD at 15. Defendant's argument is deceitful, as Defendant crops the image above the line that reads "instance.optIn ('315259641998531', 'AutomaticMatching', true)," which shows that Defendant "capture[s] and transmit[s] an email address through Automatic Advanced Matching":

```
34  fbq.registerPlugin("315259641998531", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin("
35  fbq.loadPlugin("identity");
36  instance.optIn("315259641998531", "InferredEvents", true);
37  fbq.loadPlugin("jsonld_microdata");
38  instance.optIn("315259641998531", "MicrodataJsonLd", true);
39  config.set("315259641998531", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
40  fbq.loadPlugin("inferredevents");
41  fbq.loadPlugin("identity");
42  instance.optIn("315259641998531", "AutomaticMatching", true);
43  fbq.loadPlugin("iwlbootstrapper");
44  instance.optIn("315259641998531", "IWLBootstrapper", true);
45  fbq.loadPlugin("iwlparameters");
46  fbq.loadPlugin("inferredevents");
47  instance.optIn("315259641998531", "IWLParameters", true);
48  fbq.set("iwlExtractors", "315259641998531", []);
49  fbq.loadPlugin("cookie");
50  instance.optIn("315259641998531", "FirstPartyCookies", true);
51  fbq.loadPlugin("inferredevents");
52  fbq.loadPlugin("microdata");
53  fbq.loadPlugin("identity");
54  instance.optIn("315259641998531", "AutomaticSetup", true);
55  fbq.loadPlugin("automaticmatchingforpartnerintegrations");
56  instance.optIn("315259641998531", "AutomaticMatchingForPartnerIntegrations", true);
57  config.set(null, "batching", {"batchWaitTimeMs":501,"maxBatchSize":10});
58  config.set(null, "microdata", {"waitTimeMs":500});
```

FAC ¶ 95. Defendant also ignores the allegations concerning the "customized parameters," which show that Defendant "capture[s] and disclose[s] the information entered into … form fields," including inputs into the "EmailAddressBox." *See id.* ¶¶ 99-101.

Defendant then argues that, even if it discloses email addresses, those identifiers cannot constitute PII because the FAC "expressly says that Facebook (now Meta) 'hash[es] the customer information on the website before they've sent to Meta to help protect user privacy.'"[4] *See* MTD

---

[4] To "hash" information means to assign "a numeric or alphanumeric string to a piece of data via the application of a function whose output values are all the same number of bits in length." OXFORD ENGLISH DICTIONARY (3d ed. 2001).

at 16.  But case law has consistently explained that hashing information does not mean that it cannot be looked up by the recipient and therefore constitute PII.  *See*, *e.g.*, *Robinson*, 152 F. Supp. 3d at 182–83 ("Disney could not disclose the information at issue here, along with a code that enabled Adobe to decrypt the hashed serial number and other information necessary to determine the specific device's user, and still evade liability."); *In re Hulu II*, 2014 WL 1724344, at *11 ("One could not skirt liability under the VPPA, for example, by disclosing a unique identifier and a correlated look-up table."); *see also Perry v. Cable News Network, Inc.*, 2016 WL 4373708, at *4 n.7 (N.D. Ga. Apr. 20, 2016) ("[H]ad Defendants disclosed the unique identifier along with some sort of correlating look-up table, a violation might be present."); *Locklear v. Dow Jones & Co., Inc.*, 101 F. Supp. 3d 1312, 1317 (N.D. Ga. 2015), *abrogated on other grounds*, *Ellis v. Carton Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) (quoting the "correlated look-up" excerpt from *In re Hulu II*).

Finally, Defendant argues that "information collected from the user by Facebook via the c_user cookie is not information disclosed by Facebook."  MTD at 17.  To support this argument, Defendant analogizes to the federal Wiretap Act, under which the Third Circuit held that parties who received data from cookies were considered parties to the communication rather than third parties.  *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 145 (3d Cir. 2015) ("*In re Google Cookie*").  But this holding was expressly rejected by the First, Seventh, and Ninth Circuits.  *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 608 (9th Cir. 2020) (finding Facebook a third party to a communication and holding the "simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception"); *id.* ("The First and Seventh Circuits have implicitly assumed that entities that surreptitiously duplicate transmissions between two parties are not parties to communications within the meaning of the Act.") (citing *In re Pharmatrak, Inc.*, 329 F.3d 9, 22 (1st Cir. 2003); *United States v. Szymuskiewicz*, 622 F.3d 701, 703, 706 (7th Cir. 2010)).  And even the Third Circuit itself impliedly rejected Defendant's argument in *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016), in which it found that the *In re Google Cookie* holding was dispositive as to the wiretapping claim asserted, but not as to the VPPA claim also asserted by the plaintiff.  *See Id.* at 278 ("[O]ur spadework in [ *In re Google Cookie*] goes a long way towards resolving this case," but "[t]he plaintiffs bring [] claims … for violation of the Video Privacy Protection Act … that require us to break new ground").  Importantly, the only

other court to consider the issue in the context of the VPPA found that cookies *were* sufficient to give rise to liability for a website defendant. *See In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1093 (N.D. Cal. 2015) ("*In re Hulu III*") (finding a claim was stated based on this allegation: "[F]rom April 2010 until June 7, 2012, when the Like button loaded, it would prompt the user's browser to send Facebook both the user's numeric Facebook ID (from the c_user cookie) and the title of the video that the user was watching (contained in the Hulu watch-page address).").

Moreover, Defendant's interpretation—asking the Court to essentially carve out cookie data from the VPPA's reach—belies the plain meaning of "disclose." OXFORD ENGLISH DICTIONARY (3d ed. 2001) (defining "disclose" as "[t]o uncover and expose to view (anytime material)"); *see also* FAC ¶ 3 (alleging Defendant transmitted this information "[u]nbeknownst to Plaintiffs and members of the Classes"). Defendant's interpretation also upends the legislative intent. S. Rep. 100-599, at 5-6 (expressly contemplating "interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers"); *id.* at 8 (seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers"); *In re Hulu I*, 2012 WL 3282960, at *6 ("Given Congress's concern with protecting consumers' privacy in an evolving technological world, the court rejects the argument."). Finally, to the extent there is any ambiguity, the term "disclose" should be interpreted broadly. *Cf. Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) ("'When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.'").

## III.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION KNOWINGLY

Defendant argues Plaintiffs only make "the conclusory allegation that Fandango 'knowingly' discloses purchasers' PII." MTD at 18. Defendant ignores the 154 paragraphs in the FAC that unmistakably demonstrate Defendant knowingly disclosed Plaintiffs' PII to third parties.

A defendant discloses PII knowingly when it possesses "consciousness of transmitting the private information." *In re Hulu III*, 86 F. Supp. 3d at 1095. This approach is "consistent with cases that have explained the knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the VPPA was modeled." *Id.* It does not matter whether the defendant possesses "knowledge of illegality or potential consequences." *See Senne v. Village of Paletine, Ill.*, 695 F. 3d 597, 603 (7th Cir. 2012). Nor does it matter whether "third parties actually

see the disclosed information to constitute a violation." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 671 (E.D. Pa. 2015).

Plaintiffs plausibly plead that Defendant disclosed their PII knowingly. "For the Fandango App, Sailthru's marketing materials and dashboard transparently show that Sailthru collects, analyzes, and aggregates email addresses, location data, and purchase history." FAC ¶ 154. To disclose this information in the first place, Defendant must have "integrate[d] the Carnival Mobile Marketing API … into its App." *Id.* ¶ 21; *see also id.* ¶¶ 59-60. Thus, "[b]y using Sailthru's platform, Fandango understood it was disclosing its consumers' PII." *Id.* ¶ 154. "And for the Fandango Website, Defendant must use the Custom Audiences that Facebook creates in order to target its advertisements." *Id.* To do so, "[t]he Fandango Website integrate[d] the Facebook Tracking Pixel." *Id.* ¶ 62. Accordingly, "Defendant understood it was disclosing its consumers' PII." *Id.* ¶ 154; *see also id.* ¶ 112.

Far from a "convoluted mosaic theory" (MTD at 19), Plaintiffs exhaustively support their claims with factual allegations. Notwithstanding this, should a semblance of skepticism remain, courts relax the pleading requirements "where information is in a defendant's sole possession." *McCrohan v. Sandulli Grace, P.C.*, 369 F. Supp. 3d 324, 335 (D. Mass. 2019) (internal quotations omitted). This is particularly true with regard to allegations concerning "knowledge," which "may be alleged generally." Fed. R. Civ. P. 9(b).[5] At a minimum, therefore, Plaintiff's allegations are sufficient to move beyond the pleading stage and into discovery.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion should be denied in full.

Dated: July 11, 2022                          Respectfully Submitted,

                                              By: */s/ Christopher R. Reilly*
                                                  Christopher R. Reilly

                                              **BURSOR & FISHER, P.A.**
                                              Christopher R. Reilly (SBN 1025097)
                                              701 Brickell Avenue, Suite 1420
                                              Miami, FL 33131
                                              Telephone: (305) 330-5512
                                              Facsimile: (305) 676-9006

---

[5] Of course, Plaintiffs' allegations in general are subject to Fed. R. Civ. P. 8 because they do not sound in fraud.

E-Mail: creilly@bursor.com

*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 11, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Christopher R. Reilly*
Christopher R. Reilly